May it please the court, my name is Tori Lewis and I represent the appellant Kendrick Story on this appeal joining me at council table as my partner Rob Schaefer. The question for this court to consider today is a fairly straightforward one. Why? Why was Mr. Story subjected to a visual body cavity search when he was returning to the Randall Williams unit from the Pine Bluff unit school? Why was the search occur on two video cameras and was recorded? Why were female guards watching and observing the search from the control room? And why was Mr. Story called a monkey during the search and harassed? Without satisfactory answers to these questions evident on the face of the complaint, Mr. Story respectfully requests that this court reverse the dismissal under 1950a and remand this case to the lower court for further development of the factual record. Well how about with respect to the first question, doesn't the complaint suggest that he was coming from outside the secured perimeter? Well your honor, we know he was coming from the Pine Bluff unit school back to the Williams unit, so it was a unit to unit transfer it appears. Now whether that was outside the security of the perimeter of the prison is really not evident from the face of the complaint without knowing more about the prison and the way the prison operates. For instance, here we don't know if there was particular contraband or materials that he received at the school that would justify a search as he returned to the prison. I think that's it, yeah I guess that's kind of the question. Isn't it sort of presumptive that that's a possibility and therefore it would be reasonable to search him as he's coming back to his primary facility? That's a presumption that the state would like to make in this case, but on the face of the complaint I would argue that we don't necessarily have those facts there to allow us to make that presumption. However, even if the court is willing to treat this as a typical unit to unit transfer or under conditions where there might be some special security threat particular to this to the facts of this case, we still have additional factors here as far as the intrusiveness of the search that need to be addressed. For instance, one obvious question, why were females observing the search in the control room? And I will point out that in his statement of the case with respect to defendant Lowe, he states when female guards were observing the cavity search, implying more than one, well one or more than one, why was that necessary? Why was it necessary for them to be in the control room and why watching the search? So what's your solution, that there should be no females hired for those jobs? No, your honor, we would not suggest that at all, but rather cross-gender viewing in the context of a visual body cavity search is an added intrusion that this court has never approved thus far. And we would respectfully suggest that at least further fact-finding be determined to see whether it's necessary to have females, and particularly multiple females, viewing the search. Also, on the face of this complaint, we don't know that they were simply monitoring the cameras. We see that they are, quote, watching the search. What is watching and the control room? And I think that's a distinction that deserves further elaboration from the record. If these female correctional officers are professional people working in the same capacity as the men, what is it about their presence that makes the search unreasonable? What is it about females versus males that makes it unreasonable? Can you articulate that? Yes, your honor. This court has, and other courts, have recognized an additional layer of intrusion into the prisoner's Fourth Amendment rights when there is the cross-gender presence. So, for instance, the Tenth Circuit... But why is that, is my question. Why is it different? Why is it viewed as more intrusive? Well, in the same way that a visual body cavity search is more intrusive than a pat-down search, I would say that the cross-gender viewing is more intrusive because there is, within anyone's private person, there's the desire to keep themselves clothed and keep themselves out of that kind of view, and particularly away from that kind of view of the opposite sex. And here we have that opposite sex viewing that's alleged on the face of the complaint. Sure, there may be employment interests on the other side that would weigh in favor of this state allowing women access to all areas of the prison, but in these kinds of searches that are particularly intrusive, visual body cavity searches, the additional intrusion of someone of the opposite sex being present and watching and viewing, it's about the effect that it has on that inmate. Also, with respect to the cross-gender viewing, I would note that this court has never actually approved cross-gender viewing in a visual body cavity context outside of exigent circumstances. We had the Hilvey-McKinley case where there was cross-gender viewing and, in fact, cross-gender searching, but there were exigent circumstances there. She was being non-cooperative with the search and was being violent, but this court also said that it was unconstitutional that that cross-gender viewing continued after the plaintiff in that case had been fully restrained and the exigent circumstances no longer existed. In the Tenth Circuit in Hays v. Marriott, there was an alleged search in front of a large group of people. Several of them were alleged to be female guards, and the court said that that stated a Fourth Amendment claim. Similarly, in the Fifth Circuit in Hutchins v. McDaniel, there was a visual body cavity search that occurred at least in the presence of one female guard, and the court said that that was sufficient to state a Fourth Amendment claim. We also have, within the Eastern District of Arkansas, a district court case, Bumgardner, in which one female guard was watching a visual body cavity search, and that survived the 1915a threshold that we have here. And here, we have this allegation of females, plural, and we're not sure why they were there or why they were watching. Were they simply monitoring cameras and not really watching the search, or were they actually watching, as is alleged on the face of the complaint? And that question should get us to the next level. If that were the only question we have here, that would be one thing, but we also have additional questions. Why was Mr. Story harassed and called a monkey during the search? This court has said, in the context of a visual body cavity search, which is incredibly intrusive, it must be no place under the Fourth Amendment. In Goffey-Nicks, this court generally affirmed a policy of visual body cavity searches, but in footnote 9 of that opinion, this court noted that the district court actually enjoined certain of the searches in which there had been harassing language or inappropriate comments that were made to the inmates, and this court affirmed that injunction. In other words, granting the prisoner Fourth Amendment relief simply because some comments were made during the searches that were inappropriate. And I think, going back to Judge Colleton's question, it goes to the intrusive nature of a visual body cavity search and what can be conducted during that particular intrusion. We visited about intrusion with respect to the added intrusion of females, but this would be the additional intrusion and inappropriateness of comments during that search. Is the female intrusion based on the sexual attraction between the two? Is that the idea? I don't think it's simply based on that, Your Honor. Now, there are some cases, for instance, in Seltzer Bay v. Dello, where this court addressed a circumstance in which there was a search and inappropriate sexual comments were being made, and the consequence of that was that it was a violation of the Fourth Amendment. But with respect to the female viewing, I think it's just the opposite sex presence is sufficient there to create an additional intrusion into that individual's rights. But why? I'm still wrestling with why. It must have something to do with the sexual nature of the fact that the opposite sex is present? Or would the same argument work with a male guard who was sexually oriented toward men? I think the claim would be a little different there. If we were to take it out of the prison context, I think it's understandable that cross-gender viewing is different than viewing a nude person of the same gender. So, for instance, we see locker rooms all of the time where people are in a group, and there's no question about that. But then you have a cross-gender aspect of it that adds something inherently different, that there's a cross-gender viewing aspect there. And courts have viewed it as different as well. Additionally, obviously here we also have the additional comment of being called a monkey, which is verbal harassment that this Court has already said is not appropriate under the Fourth Amendment context. I will point out that the case that was cited by the lower court there, and that was also cited by the state in response, Lewis v. Jacks, was not a Fourth Amendment case at all. Do you think that a prisoner who needs medical care is guaranteed a physician of the same sex? No, Your Honor. I think that probably would be a different case. And needing medical care I think would present, too, the obvious justification on the face of the complaint that lacks here. Well, but if you could have a female physician treat a male prisoner because of the need for medical care, why wouldn't it be permissible to have a professional female guard in charge of security, which is also a legitimate need of the state? Right, Your Honor. Security is generally a legitimate need. Importantly, though, this Court looks at the additional intrusion and the justification proffered for the additional intrusion at every level. So, for instance, in the female viewing of the patient who would need medical care, yes, perhaps it's a female, but there may be a legitimate justification why that would be so. For instance, the need for medical care. I thought your argument would imply that, no, they have to find a male physician because it's less intrusive. I think that would be determined by what the prison could proffer as its legitimate justification for the search there. If it's apparent on the face of the complaint that, no, they have a female doctor, for instance, and there aren't any male doctors that would be present to take care and treat that patient, then that would be justified under those facts. Importantly, I just don't think we know enough here about why those guards were in that room and what they were, in fact, doing. In fact, on the face of this complaint, we cannot even see that they were necessarily serving any legitimate purpose. They were watching the monitoring cameras, and why would there be more than one monitoring cameras? I would opine that at this stage, we just have too many questions and not enough answers. Are there any cases that uphold a Fourth Amendment claim based solely on words, in other words, that don't also involve inappropriate or unnecessary touching? Well, Your Honor, I would point to Goffey-Nicks in that footnote 9 that I referenced. By just that, that stated a Fourth Amendment claim, according to the lower court and then this court. Of course, in Seltzer Bay, there was the additional, I think there was touching in that case, actually, which did make it a little distinct. But at the end of the day, on the face of Mr. Story's complaint, we just simply have too many questions and not enough answers. Ultimately, the state may be able to proffer legitimate justifications for the nature of the search that was conducted here, but on this fact, and under the precedent of this court, I would urge the court to allow Mr. Story to go on to that next stage. And if there are no further questions, I'll reserve the rest of my time for rebuttal. What was the part of the complaint that you said referred to multiple females? I would reference a statement of the case for Defendant Lowe. No, I'm talking about the complaint. It's not in the complaint, you mean? No, Your Honor. I believe it's... Well, I do believe it is. The statement of the case... Statement of the claim, I mean, which would be on page... Oh, all right. I'm sorry. His statement of the claim against Lowe. Yes, on page eight of our joint appendix. That says... Yeah, where is it? Where in there? It's toward the bottom, about six lines from the bottom, when female guards was observing the cavity strip search that was done on camera. Yeah, okay. Thank you. Okay. All right. Thank you very much, Ms. Lewis. Now we'll hear next from the Assistant Attorney General, James Howell. Good morning. May it please the court. My name is J.O. Howell, and as Your Honor just said, I'm from the Arkansas Attorney General's office here on behalf of the appellees in this case. And I'd like to start by trying to clear up some confusion that seems to come up. On page six of the joint appendix under the plaintiff's statement of the claim, a few sentences down, he states that the opposite gender was able to watch everything. She was working in the master control room where the cameras are watched. Then further down towards the bottom, talking about the cameras, he says that the... Excuse me, the log sheet. He says the log sheet will prove that there was a female guard working in the master control room. So it seems more likely than not that there was only one female guard in the master control room. And it seems clear from the language in this that she was not present. She was just viewing things from monitors somewhere far removed from the area where the search was actually being conducted. Now in 1996, Congress enacted the Prison Litigation Reform Act. It required district courts to screen pro se inmate complaints and to dismiss all of complaints that just failed to state a claim for relief. And that's exactly what Judge Marshall did in this case. He identified every possible claim that was in the complaint, even the ones that weren't clearly stated, and went through one by one and explained why the law just did not support a constitutional violation in each of those cases. And then the plaintiff even asked for reconsideration. Judge Marshall again addressed those concerns and cited to the law the reason why there just wasn't a case here. And Congress, of course, intended for the judges to apply the law as it evolved. The Fourth Amendment only prohibits unreasonable searches. And to read a quote from the recent Florence case with Justice Kennedy writing for the court, he began by saying, in addressing this type of constitutional claims, courts must defer to the judgment of corrections officials unless the record contains substantial evidence showing that the policies are unnecessary or unjustified response to problems in jail security. Do we have enough of a record here to implement the sort of deference that was described in that case? I think that this case is a good example of the judge taking the face of the complaint and applying the law that applies. Just as the first question was why. Why was he searched? It's because he was coming from another prison unit. He had left the prison grounds and each warden is responsible for safety and security within his own perimeter fence. There is no reason or no way for the officials at the Randall Williams unit to know what might have been going on at the Pine Bluff unit. And it says that it's the school program. Whether or not there were free world people who were employed at that unit or people who are not as diligent in security as the people at the gates at Randall Williams isn't known. But it can be presumed. And the Eighth Circuit case law certainly allows for prison officials to require inmates coming into a prison to be strip searched. And from Florence, the Supreme Court has made clear that even pre-trial detainees can be strip searched when they're entering a general prison population. This court laid the groundwork for these cases in Belle v. Woolfish. And in that case, the court said that there's no precise or mechanical application of this reasonableness rule. But you generally look to the where, the how, and the why. This court then first addressed the issue head-on in Goffey-Nicks. And in that, the court noted that these types of cases carry a limited scope of judicial inquiry. In that case, the court specifically looked at strip searches for prisoners leaving and coming back into units, strip searches before and after contact visitation, and even strip searches before and after going out to the exercise yard. And I know that on its face, that might seem extreme. Somebody who's already in the prison just going to a different area. But as Judge Marshall and our Eastern District judges are aware, and I'm sure the panel is, going out into the yard is one of the places that inmates are able to pick up contraband. Even the fence itself in some of the smaller pens that the inmates go to. The fence wire is a piece of contraband that's regularly torn and worked off and then used to make a piercing weapon. And the Arkansas Department of Correction had a guard killed in 2012 from just that type of weapon when it was found that a piece of fence wire was removed from the bottom of one of the exercise pens. So that there is security interest embedded in all of these cases. And those are obvious to the court. And it certainly was not error for Judge Marshall to apply common sense in this case and screening the matter. What do you say about the female guard viewing? Even if it is just one. Although I know your references are to places where he says one, but he does elsewhere say guards. The argument is, okay, assuming you have a security interest that allows for strip searching when he moves from the school back to the prison, it's not reasonable to have the women viewing it. And you heard the cases cited that say that maybe in other circuits it's a claim or is part of a claim. Do you want to address that any further? Yes, sir. If you'll pardon me for just a moment. This court has twice addressed females in the corrections context. In 1990 in the Tim case that Judge Marshall cited in his order, they said that there's no Fourth Amendment violation. That is that it's not unreasonable for female guards to either conduct pat searches of male inmates or to, and I think the gist of that case was to casually observe male inmates in various states of undress. And it also talked about the need for surveillance. And in that case, one of the components was the female guards raised the issue that, well, if we're not allowed to work in a prison, there's an equal protection concern there. And just for simple staffing purposes, the prisons have to be able to allow female employees. And as Your Honor was asking the question a moment ago, I was writing down a note to myself. It does seem that some courts make a distinction between viewing cross-gender nudity in a context of medical professionals, but there is somehow a line drawn between corrections professionals. Why that line is there is unsure. But there seems to be, at least in the courts that have addressed it, a difference in this casual observation of females viewing males or males viewing females and actually being in that person's presence and inspecting that person, conducting the search. And that's clearly not what was happening here. There was just a female in a control booth, as this inmate said, looking at the monitors for all the cameras. Whether or not she even saw this is unclear, but frankly it doesn't matter. And in the Hill case, this court even said that in certain circumstances, in cross-gender applications, the person can go hands-on. In that case, there were male guards that physically restrained a female who was being combative and unruly after she'd been arrested for public intoxication. Now, the court did say that there was a finding of a constitutional violation in that case, but it wasn't related to the officers first viewing the arrestee when she was in the padded cell. It wasn't related to when the officers were physically escorting that female naked down the hallway to the restraint board. And it wasn't them actually placing her naked on the restraint board. The violation occurred when hours went by without her being afforded some modicum of dignity. The facts were unclear, but it appeared that she went about three and a half hours naked, with a spread eagle strapped down on a table, and only just before she was removed from that, long after any danger had passed, was she allowed to have a towel draped over her lower back and bottom. The court has before talked about the tone that the Supreme Court takes in analyzing these cases. And what started off with deference in Belle v. Woolfish in the very general sense, I think has only firmed from the Florence case. And I know in the opening brief, my friend says that this court has cautioned against blanket judgments. Well, in Florence, the court threw out a blanket rule that without justification or reasonable suspicion or probable cause, a correctional facility has justifiable reason to search even an arrestee when they're entering a prison population. And if there are no more... How about the act of major foot, of calling a story a monkey, and doesn't that reach the standard of being a demeaning visual body cavity search? Judge Marshall appropriately viewed those claims separately. Calling somebody a name, saying an insult, even if it happened, is a breach of professionalism, but not a constitutional violation. In the same way... But it occurred during the search. Yes, sir. I think there are cases that suggest that it's not supposed to be done in a demeaning manner. Well, and there's nothing in the record to suggest that that was racially motivated. Instead, that was the result of Mr. Story saying that he couldn't bend over all the way because he had a back problem. A reasonable security officer asking somebody to do a routine strip search, seeing that person say, oh, I can't bend over, I can't comply with your order, is going to immediately become suspicious. So that they made him bend over a couple of times for the search is not unreasonable. If a comment was said, it was nothing more than a breach of professionalism and doesn't change the reasonableness of this search, just like it doesn't affect the reasonableness of all the other searches that happened that day with the other inmates who were coming into the prison. And if there are no more questions, I'll... There's no issue of qualified immunity that's been raised here by the state on appeal in defense of the order. We're strictly looking at a Fourth Amendment question. No, sir. Our brief did not address qualified immunity. But to the extent that it could be argued, I think that it's clear from the state of the case law right now, both at the Supreme Court and the Eighth Circuit, even if the court could find a violation in this search, which I certainly don't think it should, that was not a clearly established violation at this time. Well, you didn't brief that? No, sir. We stuck to Judge Marshall's ruling and tried to not throw in any affirmative defenses or arguments on that. Are the defendants all individuals? Individual and official capacities. And yes, the department itself was not named, if that's a better answer to your question. Well, was there a... I forget. Was there a request for any kind of relief, injunctive relief against the institution? I believe that there was a request for money. That's on page 12 of the joint appendix. He states that what he has is number 3, that he's suing everyone for money and any and all other relief. I see. Thank you. If there are no other questions, I'll take a seat and be back to speak to you again in a moment. Very well. Does Ms. Lewis have additional time? She does, Your Honor. Two minutes and one second. Two minutes, not one. Thank you, Your Honor. Mr. Howe mentioned a phrase that I really liked. He said modicum of dignity in reference to a search. And I think that is sort of the crux of the case here. As Judge Grunder pointed out, there was a harassing comment made in the context of a very intrusive visual body cavity search. And as Judge Colleton addressed earlier, there was cross-gender viewing of a very intrusive visual body cavity search. One search in which it's difficult to find a modicum of dignity to begin with. And then when you add additional factors, it makes it even more intrusive. To go to Judge Colleton's question regarding the distinction between doctors in a prison facility and guards, I think one distinction that could be drawn maybe from the case law that we see in other circuits is that there's this inclination that when you go to a doctor for a health reason, it's voluntary. These searches are anything but voluntary. And that could be a distinction that could be drawn. Well, I understand that. And I thought you might say that originally. But the question I posited was, what if the prison provides only the female physician? If you and I go to a doctor, we can choose. But an inmate probably is more constrained. Yes, Your Honor. It may be that the prison might say, today's duty physician is a female and somebody has an incident and needs attention today. You see the female. Yes, Your Honor. It would make the choice a little less voluntary. But nonetheless, the prisoner usually in that case is recognizing their interest in going and complying with that search that would be conducted in a physician's office for health reasons, whereas they do not personally have an interest in a VBC search being conducted of their person and would have less inclination and less reason to pursue that on their own. I would also point out that the Tim V. Gunter case that the state highlights, in that case this court pointed out that although cross-gender viewing of inmates in their cells was constitutional in that instance, in that case they were also dealing with, and I see my time has expired. You may continue and complete your answer. Thank you. I appreciate it, Your Honor. There were windows in the cell and the court noted, this court noted that it was only a requirement that the guards go by and view flesh in the cell. They were not watching. They were not observing these inmates as they were standing nude or engaging in their activities in nudity. They were simply observing flesh in the cells, and so that was a distinction that could be drawn from that case. I appreciate the court's time. No further questions. Thank you. Thank you very much. We will consider the case under submission and render a decision in it in due course, and we thank you both for your presentations here today.